IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Scott R. Richardson, Director of the South Carolina Department of Insurance, as Rehabilitator of Capital Assurance Risk Group, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Munninghoff, Lange & Co., *et al.*, <br><br> Defendants. | Civil Action No. 10-cv-00124-CMC <br><br> OPINION AND ORDER <br> ON MUNNINGHOFF DEFENDANTS' <br> MOTION FOR <br> PARTIAL SUMMARY JUDGMENT |

Through this action, Plaintiff seeks recovery on behalf of Capital Assurance Risk Retention Group, Inc. ("CARRG") for, *inter alia*, alleged acts of professional negligence and negligent misrepresentation by CARRG's former auditors and actuaries.[1] The matter is now before the court on motion for partial summary judgment filed by the Munninghoff Defendants, who are sued for their actions as auditors.[2] Specifically, the Munninghoff Defendants seek partial summary judgment to the extent Plaintiff's claims relate to or are premised on CARRG's accounting treatment of its loss reserves and the related representations or omissions in the Munninghoff Defendants' audits of CARRG.[3] For the reasons stated below, this motion is granted.

---

[1] Plaintiff is the Director of the South Carolina Department of Insurance ("SCDOI") and is proceeding in his role as Rehabilitator for CARRG. Thus, for purposes of this action, Plaintiff stands in CARRG's shoes. *See infra* Discussion § I.

[2] The moving Defendants include Munninghoff, Lange & Co.("Munninghoff"), Thomas J. Munninghoff, and Robert J. Barker (collectively, "the Munninghoff Defendants").

[3] The motion does not address any allegations of negligence arising from the Munninghoff Defendants' audits of any related entity.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The same standards apply to resolution of fewer than all issues in an action. *See* Fed. R. Civ. P. 56(d)("If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue.")

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

**BACKGROUND**

With respect to the Munninghoff Defendants, the essence of Plaintiff's claims is that these Defendants' audits of CARRG's 2004 and 2005 financial statements negligently misrepresented (or failed to disclose) CARRG's true financial condition.[4] The present motion addresses only one aspect of the audits and underlying financial statements: the Munninghoff Defendants' treatment of CARRG's failure to maintain adequate loss reserves. Those reserves were necessary to cover liability of CARRG's insureds including, most critically, Ultimate Warranty Corporation ("UWC") which was also CARRG's largest stockholder.[5]

The Munninghoff audits did not represent that CARRG's loss reserves were adequate. Instead, they included disclaimers as to this subject matter with an explanation of the basis for the disclaimer. For example, the audit report for the 2005 financial statement provided as follows:

---

[4] Plaintiff has asserted two causes of action against the Munninghoff Defendants, one for negligence and the other for negligent misrepresentation. *See* Complaint ¶¶ 38, 41.

[5] CARGG is a "captive insurance company" meaning that it was organized for the purpose of insuring the liability of its owners. *See* Dkt. No. 43 n.2. UWC (also referred to as "Ultimate Warranty Group," or "UWG" in some memoranda) was the largest of these owners (and insureds), holding 80% of CARRG's stock. *See* Dkt No. 61 at 2. UWC was in the business of issuing vehicle service contracts ("VSCs"). The insurance CARRG provided UWC served two purposes. First, it protected UWC by covering UWC's losses to the extent claims paid on the VSCs exceeded 65% of the collective amounts paid for the underlying contracts. Second, it protected the purchasers of the VSCs in the event UWC failed or was unable to pay claims. This latter liability was direct and complete.
 As a condition of licensing CARRG, SCDOI required that UWC retain 65% of the amount paid for VSCs in a trust account or Loss Reserve Fund ("UWC Trust Fund"). (In other words, the uninsured amount of UWC's potential liability to VSC purchasers.) These funds were to be used solely for paying warranty claims.
 Rather than complying with this requirement, UWC spent much of the money in the UWC Trust Fund for unauthorized purposes. This ultimately led to UWC's inability to pay claims and, consequently, shifted that obligation to CARRG. Because CARRG had also failed to maintain loss reserves (the necessity for which was triggered largely by UWC's failure to maintain the UWC Trust Fund) CARRG ultimately became insolvent.

3

> As discussed in Note 2, at December 31, 2005 and 2004, *the Company [CARRG] has not booked any loss reserves*, which are solely based upon the financial condition of the Company's stockholders (insureds). The need to pay out on these policies would result from the inability of the insureds to cover claims. *The insureds have suffered recurring losses from operations and have a capital deficiency* at December 31, 2005 and 2004. In addition, the Company's independent consulting actuary has indicated in his report that as of December 31, 2005, the insured[s] have an estimated deficit of approximately $13,400,000 on a discounted accrual basis, for warranty contracts issued on or before December 31, 2005. *Due to these factors, we were unable to satisfy ourselves with regard to the Company's unpaid loss and loss adjustment expenses liability* as of December 31, 2005.

Dkt. No 43-2 at 3 (emphasis added). The audit of the 2004 Financial Statement included similar qualifying language. Dkt. No. 43-5 at 3. Both audits explained the basis of the auditors' concerns as to the loss reserves in "Note 2," which consisted of a full page of discussion of this topic following the heading "NOTE 2– RISKS AND UNCERTAINTIES." Dkt. No. 43-2 at 10; Dkt. No. 43-5 at 11.

Plaintiff alleges that, despite these disclosures, the audits violated generally accepted accounting standards ("GAAS") and were inadequate to alert CARRG and others, including SCDOI, to the risk that CARRG would become insolvent due to the inadequacy of its loss reserves. For example, Plaintiff's expert, Joseph DeVito, opines that the audits were inadequate because they "did not disclose the effect of the subject matter of the qualification on CARRG's financial statements." DeVito Aff. ¶ 7. DeVito also opines that, because "there was no scope restriction" in the audit, the auditors were "required to perform appropriate procedures in order to adequately disclose the financial impact of the exception noted in their opinion[.]" DeVito Aff. ¶ 8. *See also* Discussion § III (discussing DeVito opinion).

Plaintiff's theory as to how the alleged inadequacy injured CARRG is set forth in DeVito's report as follows:

4

> In my opinion, as a result of [Munninghoff's] professional negligence, CARRG sustained financial damage in the amount of approximately $8.4 million. At all relevant times, CARRG's authority to operate as a [risk retention group] was contingent on its compliance with [its certificate of authority issued by SCDOI].
>
> Had [Munninghoff] conducted its audit as of December 31, 2004[,] in accordance with [generally accepted accounting standards], it would have determined that CARRG was required to record loss and loss adjustment expense reserves that exceed its Stockholder's Equity, rendering CARRG insolvent. . . . For purpose of my damage computation, I was asked by [Plaintiff's counsel] to assume that, at least as early as June 30, 2005, the SCDOI would have known of CARRG's insolvency and would have taken immediate regulatory action. Had the SCDOI taken CARRG under Receivership as of June 30, 2005, CARRG would have ceased writing new business and would not have been obligated for losses incurred on Policies issued on or after July 1, 2005. In general, the damage represents the estimated loss that CARRG incurred as a result of its continuing business from July 1, 2005 through October 31, 2007.
>
> To compute the estimated damage sustained by CARRG that was caused by [Munninghoff's] professional negligence, . . . I obtained the projected ultimate premiums and related losses on Policies issued from July 1, 2005 through the Receivership Date that would have otherwise not been incurred by CARRG, had the SCDOI taken CARRG under Receivership as of June 30, 2005.

Dkt. No. 61-9 at 12-13 (DeVito Report § 3.7).

## DISCUSSION

### I. Plaintiff's Capacity

In responding to the present motion, Plaintiff makes various references to the Munninghoff Defendants' obligations to third parties who may have relied on the audits and possible resulting injuries to those third parties. For example, Plaintiff argues that "[h]ad the Munninghoff Defendants' properly upheld their professional standards, SCDOI would have known the true depth of CARRG's insolvency much earlier and taken appropriate regulatory action to mitigate damages to CARRG, *its creditors, and the vehicle service contract holders that it insured*." Dkt. No. 61 at 5 (emphasis added); *see also id.* at 7 (stating that these Defendants' "duty to speak extended beyond

CARRG *to the SCDOI*") (emphasis added). Plaintiff also includes similar allegations in the complaint. *See* Complaint ¶ 41 ("In the CARRG Audit Opinions, [Munninghoff] misrepresented *to the SCDOI*, CARRG *and to the creditors of CARRG*, *inter alia*, that CARRG was solvent, that its financial statements were free of material misstatements, and, that with some exceptions, its financial statements were in conformity with [generally accepted accounting practices].") (emphasis added).

Plaintiff's standing in this action is, however, limited to standing *as rehabilitator for CARRG.* Consequently, Plaintiff may only seek recovery for injury to CARRG itself. S.C. Code Ann. § 38-27-330(c) ("If it appears to the rehabilitator that there has been criminal or tortuous conduct or breach of any contractual or fiduciary obligation detrimental to the insurer by any officer, manager, agent, broker, employee, or other person, he may pursue all appropriate legal remedies *on behalf of the insurer*.") (emphasis added); *see also Caplin v. Marine Midland Grace Trust Co. of N.Y.*, 406 U.S. 416, 420 (1972) (trustee in bankruptcy lacked standing to bring claims against a third party on behalf of creditors of the insolvent corporation); *Florida Dept. of Ins. v. Chase Bank of Texas Nat. Ass'n*, 274 F.3d 924 (5th Cir. 2001) (Florida liquidator of insolvent insurer lacked standing to assert claims on behalf of policyholders).

The court, therefore, considers Plaintiff's arguments in opposition to the Munninghoff Defendant's motion only as they relate to damages which *CARRG itself* may have suffered as a result of nondisclosure. Nonetheless, for purposes of this motion, the court will assume without deciding that Plaintiff's theory of causation and damages, as expressed in his expert's report, is viable: that CARRG may recover from its auditors for their negligent misstatements or failure to disclose financial irregularities if proper disclosure of the same would have caused a third-party,

6

here SCDOI, to place CARRG into receivership at an earlier point in time, thus limiting the amount of CARRG's ultimate losses for its own financial failings.

As the Munninghoff Defendants note, whatever knowledge was held by CARRG is imputed to Plaintiff as rehabilitator for CARRG and he is also subject to all defenses which might be maintained against that entity. *See* Dkt. No. 62 at 7. For purposes of the present motion, however, the court need not consider CARRG's knowledge or available defenses.

There is a flip side to this standing argument, and that is that knowledge and actions (or inaction) by SCDOI (or its director and employees) may not be imputed to CARRG (or to Plaintiff in his role as Rehabilitator for CARRG). This does not, however, mean that SCDOI's knowledge and actions are irrelevant given that Plaintiff's theories of causation and damages are dependent on proof that SCDOI would have placed CARRG under receivership at an earlier time but for the Munninghoff Defendants' allegedly inaccurate or deficient audits. In short, while SCDOI's knowledge and actions may not be imputed to CARRG, both remain relevant and may be determinative given Plaintiff's chosen theory of liability.

## II.  Evidence of Affirmative Misrepresentation

In their opening memorandum, the Munninghoff Defendants argue that Plaintiff's claims for negligence and negligent misrepresentation must fail (to the extent Plaintiff relies on statements relating to CARRG's loss reserves) because there is no evidence that these Defendants made any misrepresentations regarding loss reserves in their audits. In response, Plaintiff notes that "[u]nder South Carolina law, the '[s]uppression of a material fact which one is duty bound to disclose is the equivalent of a false []representaiton.'" Dkt. No. 61 at 6 (quoting *Lipman v. DeWolff Boberg &*

7

*Assoc.*, 319 Fed. Appx. 293, 299 (4th Cir. 2009).[6] Thus, Plaintiff argues that his "claims neither solely rest on *affirmative* false representations about the loss reserves, nor are they required to do so, but also include failure to disclose and omissions that created false representations." Dkt. No. 61 at 6-7 (emphasis in original).

The above-quoted argument may suggest that Plaintiff is relying on *both* affirmative misrepresentations and omissions as to the adequacy of the audit's treatment of CARRG's failure to maintain loss reserves. Prior to oral argument, however, Plaintiff did not identify any affirmative statement in the audit which was allegedly false or misleading on this subject matter. Instead, Plaintiff asserted in his opposition memorandum that the Munninghoff Defendants "purposefully *omitted* material facts about the financial condition of UWC, and thus CARRG, including UWC's failure to hold the required Loss Reserves [sic] Funds in trust," which, Plaintiff maintains, constitutes "negligence and negligent misrepresentation." Dkt. No. 61 at 7 (emphasis added); *see also id.* (citing expert's opinion that "[t]o comply with generally accepted auditing standards, auditors have a duty to do more than solely issuing a disclaimer of opinion."). Thus, prior to oral argument, Plaintiff failed to direct the court to evidence of any relevant affirmative misrepresentation.[7]

---

[6] Although the Munninghoff Defendants suggest that there may be a later dispute as to whether South Carolina or Kentucky law applies to the claims against them, they concede for purposes of this motion that the two states' laws are "in accord on the points raised in this motion." Dkt. No. 43 n.3. It is, therefore, unnecessary to "address the choice of law question" in this order. *Id*.

[7] The negligence claim is founded on allegations that these Defendants failed in their professional duties as auditors. For purposes of the current motion, the critical allegations are that these Defendants failed (1) "to properly assess the adequacy of CARRG's loss reserves," (2) "to review, verify and disclose that the Loss Reserve Funds . . . were inadequate," (3) to obtain from [UWC] appropriate supporting documentation of the asset valuation for the Loss Reserve Funds

During oral argument, Plaintiff suggested one possible category of affirmative misrepresentation relating to the *amount* of the capital deficiencies. Specifically, Plaintiff suggested that the capital deficiencies may have been substantially understated in both audits. These alleged misstatements are not mentioned either in Plaintiff's opposition memorandum or in the expert's affidavit filed with that memorandum. There is, nonetheless, some support in the underlying expert report for the argument that the amount of the deficiencies were understated. Although unclear from the present record, it *may* follow that the understatements are sufficiently large to have caused or contributed to SCDOI's delay in placing CARRG under receivership.

For the reasons set forth above, the court concludes that Plaintiff has failed to present evidence of any affirmative misrepresentations in the audits relating to CARRG's failure to maintain adequate loss reserves except with regard to the amount of the capital deficiencies. *See infra* Discussion § IV (discussing evidence of these affirmative misrepresentations). Beyond these alleged affirmative misrepresentations, Plaintiff is limited to reliance on alleged omissions of material information which these Defendants had a duty to disclose. *See infra* Discussion § III (discussing evidence of material omissions).

## III. Evidence of Material Omissions

In support of his argument that there were material omissions from the audits, Plaintiff relies on his expert's affidavit which states that (1) generally accepted auditing standards require that "[o]nce a determination is made that a clean audit opinion cannot be given[,] . . . the effect of the subject matter of the qualification on the financial position, results of operations and cash flow be

---

[UWC Trust Fund]," and (4) to advise CARRG and SCDOI that CARRG should record appropriate loss reserves, loss adjustment reserves and other reserves." Complaint ¶ 38 a,d,e,h.

9

disclosed," and (2) the auditors "had a duty to do more than solely issue a disclaimer of opinion." Dkt. No. 62 at 8 (citing DeVito Aff. ¶¶ 7-8). Plaintiff's expert opines that the audits in question failed to adequately explain the qualification because they "did not disclose the effect of the subject matter of the qualification on CARRG's financial statements." DeVito Aff. ¶ 7. Similarly, as to the duty to do more than issue a disclaimer, DeVito explains that, because "there was no scope restriction" in the audit, the auditors were "required to perform appropriate procedures in order to adequately disclose the financial impact of the exception noted in their opinion[.]" DeVito Aff. ¶ 8.

Plaintiff relies on *U.S. v. Arthur Young & Co.*, 465 U.S. 805 (1984), for the proposition that a certified public accountant cannot simply rely on a corporate representative's assurances that reserves are adequate, but must, instead, "ascertain for himself, as far as possible, whether the corporation's contingent . . . liabilities have been accurately stated." *Id.* at 818-19 (addressing reserves for tax liabilities). As the Court explained:

> If the auditor [is] convinced that the scope of the examination has been limited by management's reluctance to disclose matters relating to the . . . reserves, the auditor would be unable to issue an unqualified opinion as to the accuracy of the corporation's financial statements. Instead, the auditor would be required to issue a qualified opinion, an adverse opinion, or a disclaimer of opinion, thereby notifying the investing public of possible potential problems inherent in the corporation's financial reports.

*Id.* (quoted in Dkt. No. 61 at 9).[8]

---

[8] *Arthur Young* involved enforcement of a summons issued by the Internal Revenue Service ("IRS") to the taxpayer's accountant for the accountant's tax accrual work papers . The Court held, first, that the work papers were relevant and, second, that there was no accountant's work-product privilege which would preclude enforcement of the summons. The portion of the opinion quoted above relates to the latter holding which rested largely on distinctions between a "private attorney's role as the client's confidential advisor and advocate" and a public accountant's "ultimate allegiance to the corporation's creditors and stockholders, as well as to the investing public." 465 U.S. at 818-19.

In the present case, there is no evidence that the auditors simply relied on the representations of CARRG (or UWC) as to the adequacy of loss reserves. To the contrary, the auditors revealed the total absence of any such reserve by CARRG as well as the capital deficiency of CARRG's stockholder-insureds which might shift substantial liabilities to CARRG for which loss reserves would be needed. The auditors also questioned the actuaries' opinions as to the need (or absence of need) for loss reserves. Thus, the comments in *Arthur Young* do not suggest any actionable omission by the Munninghoff Defendants.

Plaintiff also relies on the Fourth Circuit's decision in *Rhode Island Hospital Trust National Bank v. Schwartz, Bresenhoff, Yavner & Jacobs,* 455 F.2d 847 (4th Cir. 1972), which addressed a lender's claims that it was injured by an accounting firm's negligent audit which failed to disclose the complete non-existence of assets claimed on the borrower's financial statements. The court addressed the applicable auditing standards and related deficiencies as follows:

> Chapter 10 ¶ 1 of the [American Institute of Certified Public Accountants, Statements on Auditing Procedure No. 33 (1963) ("Statements")] reads, "[t]he report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. *When an overall opinion cannot be expressed, the reasons therefor should be stated.* . . ." (emphasis added)[.] When Accountants said only that "fully complete detailed cost records were not kept of these capital improvements and no exact determination could be made as to the actual cost of said improvements," we do not think that the reasons assigned were sufficiently stated. The documentary evidence shows that no cost records for material were kept, so that Accountants' statement, viewed even in the most charitable light, was a major understatement, whatever Accountants failed to do. **Chapter 10 ¶ 9 reads "[w]hen a qualified opinion is intended by the independent auditor, the opinion paragraph of the standard shortform report should be modified in a way that makes clear the nature of the qualification. It should refer specifically to the subject of the qualification and *should give a clear explanation of the reasons for the qualification* and of the effect on financial position and results of operations, if reasonably determinable."** (emphasis supplied)[.] Accountants failed to comply with this requirement, too, when they failed to disclose that the absence of any records for material purchases led them to resort to "appraisals." Had the absence of any records for material purchases been

11

> assigned as a reason for resort to "appraisals," Bank would have been charged with knowledge that the existence of the leasehold improvements might have been in question. The disclaimer, read in conjunction with the preceding paragraphs, conveyed the impression that the leasehold improvements unquestionably existed. Similarly, Chapter 10 ¶ 14, in dealing with disclaimer of opinion, states that when the independent auditor has not obtained sufficient competent evidentiary matter to form an opinion on the fairness of presentation of the financial statements as a whole he should state that he is unable to express an opinion on such statements. Paragraph 16 then reads, **"[w]henever the independent auditor disclaims an opinion, he should give *all* substantive reasons for doing so. For example, when he disclaims an opinion because the scope of examination was inadequate, he should also disclose any reservations or exceptions he may have regarding fairness of presentation."** (emphasis in original)[.] This standard, too, Accountants failed to meet. Their disclaimer was to the effect that, because of limitations upon their examination, expressed in the covering letter, and the material nature of the items not confirmed by them, they could not express an opinion as to the fairness of the accompanying statements. They failed to state that they either did not look for or could not find evidence of material costs for the purported leasehold improvements, and either would have been more than a simple limitation upon their examination.

455 F.2d at 852 (italics in original, bold emphasis added).

The evidence of negligent omission in this case is easily distinguishable from the evidence discussed in *Rhode Island Hospital*. There, the auditors not only failed to disclose that the underlying assets were non-existent, but included statements which suggested both the existence and value of the assets. In contrast, here the cover sheets for the audits accurately reveal the following: (1) CARRG had not booked any loss reserves for the relevant periods; (2) CARRG's obligation on its insurance policies would arise (and loss reserves would be needed) if the insureds were unable to cover claims; and (3) the stockholder-insureds had suffered recurring losses from operations and had multi-million dollar capital deficiencies both as of December 31, 2005 and 2004. Dkt. No. 43-2 at 3 (indicating capital deficiencies totaled approximately $13.4 million as of December 31, 2005); Dkt. No. 43-5 at 3 (indicating capital deficiencies totaled approximately $16.8 million as of December 31, 2004) . Based on these concerns, this paragraph of the audit reports concludes with

12

a clear qualification: "Due to these factors, we were unable to satisfy ourselves with regard to the Company's unpaid loss and loss adjustment expenses liability as of December 31, 2005." Dkt. No. 43-2 at 3; *see also* Dkt. No. 43-5 at 3 (similar language in 2004 audit).

This paragraph of the cover page also refers to "Note 2" for a further explanation of these concerns. As indicated in the cover sheet, Note 2, which covers a full page of each audit, provides greater detail as to the concerns. For example, Note 2 in the later audit explains that the capital deficiency represents the "difference between the indicated claim liability and the funds available to pay claims" and provides the estimated deficiencies both for that year and the prior year. Dkt. No. 43-2 at 10. Note 2 also refers to a separate analysis by the actuary which "indicates the stockholders will meet their obligations and therefore recommends that no reserves should be recorded on [CARRG's] balance sheet as of December 31, 2005 or 2004." The auditors express doubt as to this recommendation, explaining as follows:

> This analysis is significantly based on representations provided to the actuary by the stockholder's management relative to anticipated future gross warranty revenues as well as anticipated levels of expenses . . . . *If these anticipated levels of revenues and expenses are not achieved, the ability of the insureds to continue meeting their financial obligations could be impaired.* The actuary has indicated that there is significant uncertainty in the reserve estimates due to the following: unknown frequency and severity of future warranty claims, unknown future operating results of the stockholders and no credible loss data available for certain contracts.
>
> As a result of the above factors, *it is uncertain whether or not the stockholders will be able to meet their obligations* under warranty contracts. If the stockholders are unable to meet their obligations, a portion of the $13,400,000 and $16,800,000 shortfalls will become a liability of [CARRG]. *This creates a significant uncertainty as to the loss and loss adjustment expense reserves of the Company at December 31, 2005 and 2004.*

Dkt. No. 43-2 at 9 (emphasis added). *See also* 43-5 at 11 (similar disclosure as to December 31, 2004 and 2003 financial statements).

13

In short, the information disclosed by the audit reports was more than a generic qualification of opinion. It provided a clear explanation of the nature of the qualification: significant uncertainty as to the adequacy of CARRG's loss reserves. It also explained the reasons for the qualification and revealed the scope of the concern by addressing the source and size of the underlying problem: the stockholder-insureds' multi-million dollar capital shortfalls in both years. The audits also explained the effect on CARRG's financial position by explaining that the amounts of the stockholder-insureds' capital shortfalls could become the obligation of CARRG, thus creating "significant uncertainty as to the loss and loss adjustment expense reserves."

Unlike the representations at issue in *Rhode Island Hospital*, no identified omission from these disclosures would have led either CARRG or SCDOI into a false sense of security as to CARRG's financial well-being. To the contrary, these disclosures together with the qualification of the opinion were sufficient to give both CARRG and SCDOI notice both that there were general concerns as to CARRG's financial well-being and that the source and scope of those concerns related to the insured's multi-million dollar capital deficiencies and CARRG's corresponding failure to maintain loss reserves. *See generally Arthur Young & Co*, 465 U.S. at 818 n.14 ("The inclusion in an audited financial statement of anything less than an unqualified opinion should send signals to stockholders, creditors, potential investors, and others that their independent auditor has been unable to give the corporation an unqualified bill of financial health.").

In his affidavit, Plaintiff's expert, DeVito, offers several opinions as to the Munninghoff Defendants' duties in light of these disclaimers. First, he states that these Defendants were "required to perform appropriate procedures in order to adequately disclose the financial impact of the [noted] exception[.]" Devito Aff. ¶ 8. Next, he states that these Defendants were, "*at the very*

14

*least*" required "to evaluate whether there was a substantial doubt about CARRG being able to continue as a going concern as CARRG did not have the financial wherewithal to fulfill UWC's obligations in the event of UWC's insolvency." *Id.* ¶ 10 (emphasis in original). He expands on this statement by explaining that "at the very least, the Munninghoff Defendants should have included an explanatory paragraph in its audit reports describing that substantial doubt existed about CARRG's ability to fulfill its obligations in the event of UWC's insolvency because of the significant deficit in UWC's stockholder's deficit and the loss reserve funds." *Id.*[9]

In other words, DeVito opines that the Munninghoff Defendants were required to go a step further to expressly state that CARRG's failure to maintain loss reserves (at least coupled with its stockholder's deficits) placed it in a position that it might not be able to meet its own obligations. DeVito does not, however, explain why this additional conclusion or warning was necessary to "adequately disclose the financial impact of the exception" in the face of the substantial disclosures which were provided. Further, nothing in the case law which Plaintiff cites (or the standards cited in those cases) suggests that such an explicit statement is required. Moreover, the need for greater disclosures or warnings is particularly doubtful where, as here, the target audience at issue is a sophisticated entity such as the SCDOI, or, alternatively, SCDOI and CARRG itself.[10] Under these circumstances, the court concludes that Plaintiff has failed to proffer sufficient evidence of any negligent omission relating to the Munninghoff Defendants' accounting treatment of CARRG's loss

---

[9] In referring to "UWC's stockholder's deficit," DeVito apparently means to refer either to "UWC's deficit" or "CARRG's stockholder's deficit."

[10] As explained above, Plaintiff is limited to pursing claims on behalf of CARRG. In addition, his legal theory of causation is dependent on proof that SCDOI delayed placing CARRG into receivership due to deficiencies in the Munninghoff Defendants' audits. It follows, that the relevant audience *for purposes of this action* was SCDOI or, possibly, SCDOI and CARRG.

15

reserves to raise a genuine issue of material fact for trial. *But see infra* Discussion § III (declining to grant summary judgment as to one alleged category of affirmative misrepresentation relating to this subject matter).

Even were the court to find the evidence sufficient to raise a genuine issue of material fact as to whether the alleged omissions were negligent, the court would find the evidence of causation insufficient. As Plaintiff notes, the Munninghoff Defendants' opening memorandum focuses primarily if not exclusively on whether there was sufficient evidence of a negligent act or omission to present a genuine issue of material fact for trial. The issue of causation, by contrast, comes into focus only on reply. While an issue may not be raised for the first time on reply, the shift in focus in this case is responsive to documents and arguments presented *by Plaintiff* in his opposition memorandum. In addition, the court provided Plaintiff an opportunity to respond to these arguments by allowing for oral argument.[11] Thus, Plaintiff has been afforded a complete opportunity to respond to the Munninghoff Defendant's argument as to causation.

As noted above, the Munninghoff Defendants' position as to causation is supported by documents which *Plainitiff* filed in opposition to the motion for partial summary judgment. The most critical document is a memorandum written by SCDOI's Manager of Regulatory Compliance before the first audit was conducted. This memorandum addresses the "findings of the organizational/target examination of [CARRG] completed January 31, 2003" and states that, "[w]ith regard to [UWC], the report details exceptions deemed so significant as to pose an

---

[11] The undersigned only rarely conducts oral argument on civil motions. As to the present motion, oral argument was scheduled, in part, to ensure Plaintiff was afforded an opportunity to respond fully to the arguments as to causation. Allowing oral argument also provided Plaintiff with an opportunity to raise a new opposition argument, based on evidence not referenced in Plaintiff's opposition memorandum. *See infra* Discussion § IV.

unacceptable risk to the solvency of [CARRG]." Dkt. No. 61-1 at14. The specific concerns addressed in the referenced report focus on UWC's failure to maintain monies in trust for payment of warranty claims and CARRG's related failure to maintain loss reserves. As the underlying report noted, CARRG did "not have any loss reserves or reserve for unearned premium" on its balance sheet as of the end of 2002. *Id.* at 17. This and related concerns prompted the SCDOI examiner to visit the primary owner-insured, UWC, where the examiner learned that (1) money which should have been maintained in the reserve account to pay claims "had been borrowed out regularly to make other checks good" and (2) the owners of UWC and its "head officers ha[d] large balances of loans from the Company." *Id.*

In light of the disclosures in the audits (qualification and underlying explanation), particularly seen in light of SCDOI's prior knowledge of UWC's failure to maintain reserves, no reasonable juror could find that SCDOI's failure to place CARRG into receivership at some point earlier than it decided to do so was the result of any omission from the Munninghoff Defendants' audits as those audits relate to the loss reserve fund. It follows that the Munninghoff Defendants cannot be held responsible for losses CARRG incurred because of SCDOI's delay in placing CARRG into receivership based on alleged omissions relating to the audits' treatment of CARRG's failure to maintain adequate loss reserve funds.

**IV. Evidence of Affirmative Misrepresentation**

As noted above, Plaintiff first suggested possible affirmative misrepresentations relating to the loss reserve funds at oral argument. These alleged misrepresentations relate to understatement of the amount of the capital deficiencies. Although not referenced in Plaintiff's opposition memorandum or his expert's affidavit, the expert's report does include support for the factual

17

premise that the amount of the capital deficiencies may have been substantially understated in one or both audits.[12] Moreover, Plaintiff identified this alleged misrepresentation in addressing the Munninghoff Defendant's causation argument (addressed primarily on reply) and the court's related inquiries.

Under these circumstances, the court will consider these alleged affirmative misrepresentations despite Plaintiff's failure to reference them in his opposition memorandum. In addition, for purposes of this order the court will assume without deciding that such an error might have been sufficiently severe to have caused SCDOI to delay placing CARRG under receivership. Thus, the grant of partial summary judgment does not reach any claim of negligence based on the alleged affirmative misrepresentations of the amount of the capital deficiencies.[13]

## CONCLUSION

For the reasons set forth above, the Munninghoff Defendants' motion for partial summary judgment is granted to the extent of precluding Plaintiff from pursuing any claim against the Munninghoff Defendants based on (1) omissions relating to the audits' treatment of CARRG's

---

[12] The audits speak in terms of the insureds' "recurring losses," "capital deficiency" and "estimated deficit . . . for warranty contracts." *E.g.,* Dkt. No. 43-2 at 3. The last is defined as including "the difference between the indicated claim liability and the funds available to pay claims." *E.g.,* Dkt. No. 43-2 at 10. Plaintiff's expert refers to "Dealer Reserve Deficit[s]," which appear to correspond in meaning with the "estimated deficit for warranty contracts," but reflect a somewhat higher number than is reflected in the audit. *E.g.,* DeVito Report at 25. While the deficits apparently resulted largely from the insureds' failure to maintain the required Trust Funds, the method of calculating the deficiencies does not appear to be based directly on the amounts by which UWC was "out of trust." *Compare* DeVito Report ¶¶ 3.1, 3.2, Table 2, Table 3. For present purposes, the court need not, however, resolve whatever distinctions may exist between the various terms and measures.

[13] This limitation on the grant of partial summary judgment is without prejudice to the Munninghoff Defendants' right to seek summary judgment after further development of the record.

18

failure to maintain loss reserves; or (2) affirmative misrepresentations other than misrepresentations of the amount of the capital deficiencies, reserve deficits, or amounts by which the insureds may have been out-of-trust.

**IT IS SO ORDERED.**

                                                                s/ Cameron McGowan Currie
                                                                 CAMERON MCGOWAN CURRIE
                                                                 UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
August 23, 2010